UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DALLAS B. BOYCE,

　　　　　　Petitioner,

　　v.

J. SOTO,

　　　　　　Respondent.

Case No.  15-cv-02700-EMC

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

## I.　INTRODUCTION

　　　　Dallas B. Boyce filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction for several sex offenses.  Respondent has filed an answer to the petition and Mr. Boyce has filed a traverse.  For the reasons discussed below, the Court denies the petition.

## II.　BACKGROUND

　　　　The California Court of Appeal described the evidence at trial:

> ***Prosecution Evidence***
>
> A. Prior Incidents
>
> Tanya T. (Tanya) dated appellant for about six months in 2003 and 2004. Tanya ended the relationship; the breakup was not amicable and appellant continued to call her after the relationship ended. Twice, appellant called her at work and told her, "I can see you." Both times, Tanya looked out her window and saw appellant watching her from the street or the bushes. During their relationship, appellant never mentioned sleepwalking or sleep-related issues, nor did he ask her to lock the door or hide the keys while they were sleeping.
>
> Early one October 2008 morning, Raina S. (Raina) was awakened by the sound of footsteps outside her bedroom window. She noticed a screen on the window next to her bedroom was "pulled off a little

bit." Sheriff's deputy Karen Kennedy went to Raina's home at 6:15 a.m. and saw a pick-up truck pull away from the curb near Raina's house. Kennedy stopped the truck and approached the driver, later identified as appellant. Kennedy told appellant Raina reported a prowler; in response, appellant said she had texted him that "she needed help and was he going to be around."[2] Appellant claimed he walked up to the left side of Raina's house and a light went on; he explained that when he saw the light, he went back to his truck and waited for more lights so he knew Raina was awake. Later, however, appellant told Kennedy he went to Raina's house to invite her to church that evening. Appellant responded to Kennedy's questions in a logical manner and did not appear confused.

> Footnote 2:  Although Raina and appellant were friends, he had not been to her house in "years" and she did not have his phone number.  Raina did not text appellant.

B.      The Jane Doe Incident

In April 2010, Jane Doe was living alone in a house in Napa. The back laundry room windows, which faced the backyard, did not have blinds. The other windows had venetian blinds, which Doe kept closed. From the back windows, one could see into Doe's laundry room, kitchen, and living room. Doe frequently walked to work and to Safeway.

On April 28, 2010, appellant called the police, claiming he was suicidal. The police issued a "be-on-the-lookout" for appellant. Early that afternoon, Doe went home from work. She drank two beers—uncommon for her—because she was depressed and angry. She had a difficult day at work and was "devastated" over the recent death of her dog. At 4:30 p.m., Doe walked to Safeway and bought wine and groceries to prepare dinner for a friend who was coming to her house that evening. Doe walked home, drank a glass of wine, and prepared dinner. Doe and her friend ate dinner and finished the bottle of wine Doe bought at Safeway. Then they went to a music club, where Doe drank two more beers. The two friends returned to Doe's home at 10:00 p.m. They shared a bottle of wine and talked until 11:30 p.m., when Doe's friend went home. Doe—still "angry and depressed" and anticipating a difficult day at work the following day—finished the bottle of wine and listened to music. She turned off the lights and went to bed between 12:30 and 1:30 a.m. on April 29, 2010. Doe slept in the gray turtleneck and bra she had worn to work.

Around 3:00 a.m. on April 29, 2010, Doe woke to a man—later identified as appellant—"spooning [her] ... trying to cuddle with [her]." Doe did not feel the effects of the alcohol she had consumed the night before, but she was "in shock" to find a stranger in her bed. "[D]umbfounded," Doe asked appellant who he was. He responded, "how drunk are you? Don't you remember you invited me in?" He told Doe his name was John and that he entered the house through the back door, which Doe did not use and which she assumed was locked. Doe was worried appellant was going to rape her. Doe asked appellant questions because she thought she could "de-escalate the

2

situation" if she engaged appellant in conversation. Appellant did not seem confused or disoriented.

Appellant pulled Doe's bra and turtleneck off and "got on top of [her]." Doe "smacked him across the face." He smacked her back and threatened her, saying several times: "[D]o you want to f...ing die? I'll f...ing kill you." Doe slapped appellant a second time and he repeated his threats. At one point, appellant put his hands over Doe's mouth and said to her, "you shouldn't be walking around the house like that."

Appellant kissed Doe's mouth, sucked her breasts, and told her she had "nice cakes." Then he rubbed Doe's vaginal area and "partially thrust" his fingers inside her vagina. Appellant spat on Doe's vagina to try to lubricate her. He thrust his penis into her vagina several times, partially penetrating Doe's vagina and hurting her. Then appellant rolled Doe onto her stomach and pulled her into an "all fours position." He commented, "I bet you like it this way" and sodomized her several times. Doe "felt like [she] needed to cooperate because [she] was scared for her life[.]" She did not scream, or try to run away, because she thought appellant would catch her and kill her. She also faked an orgasm because appellant told her he would leave when he was "done" and Doe thought faking an orgasm "would make things quicker."

Next, appellant turned Doe onto her back. He shoved his penis into Doe's mouth and ejaculated as she gagged. Doe spit the ejaculate onto the floor. After he ejaculated, Doe pulled up his orange shorts and walked out the door, saying nothing. Doe said, "goodbye, John" to make him think she was not upset and would not call the police. A minute or two after appellant left, Doe called 911. It was hard for Doe to find her phone or dial 911 because her "hands were shaking so much[.]" [Footnote omitted.]

Police officers arrived at Doe's house and saw she was visibly shaken. Law enforcement officers and evidence technicians noticed the back door to Doe's house was closed but unlocked, the bedding was messy, and there was a pool of semen on the floor next to Doe's bed. Crime scene photographs showed a silver pick-up truck parked on the street in front of Doe's house at 8:00 a.m. A nurse conducted a sexual assault response team (SART) examination and observed: (1) Doe had a swollen uvula, red and swollen tonsils, and tiny bruises in her mouth that can be caused by blunt force trauma; (2) Doe's vagina had a bleeding laceration; and (3) Doe's anus had multiple lacerations. The nurse concluded the physical findings were consistent with Doe's description of being sexually assaulted.

A criminalist determined the fluid on Doe's floor was semen and that a swab from Doe's breast contained human saliva. Another criminalist tested the various swabs and fluids for DNA, including a swab from appellant's penis. The criminalist found appellant's and another's DNA on the penile swab. The criminalist testified the chances the foreign DNA belonged to someone other than Doe was 1 in 280,0000 Caucasians. The criminalist found Doe's and another's DNA on a breast swab and testified the chances the foreign DNA belonged to someone other than appellant was 1.2

trillion Caucasians. An expert in wireless technology examined appellant's cell phone and determined he made 15 calls or texts in the area of Doe's residence from 2:00 a.m. to 8:30 p.m. on April 28, 2010 and used his cell phone in the area of Doe's house on the morning of April 29, 2010.

At 8:30 a.m. on April 29, 2010, law enforcement officers stopped appellant driving a silver pick-up truck. Appellant was wearing orange shorts. He was disheveled and had "fresh scratches on his face." Napa Police Officer Joseph McCarthy interviewed appellant at the police station and arrested him.

### Defense Evidence

A. Appellant's Testimony

In April 2010, appellant had been having a "hard time" with his then girlfriend, Amanda F. (Amanda), and often slept in his silver truck in Fuller Park. He sometimes made telephone calls from his truck. He was depressed and anxious and had been having difficulty sleeping. A doctor had prescribed Klonopin and Effexor XR for his depression but appellant did not take the medication consistently. Appellant sometimes took Tylenol P.M. to help him sleep, and smoked marijuana to calm down. Appellant claimed a history of sleepwalking. According to appellant, he had sleepwalking episodes in 2005 and was sleepwalking when he went to Raina's house in 2008.

On April 28, 2010, appellant—who worked as a landscaper—spent the day picking roses and "scratching [his] hands up." Around 11:00 p.m., appellant parked a block away from Fuller Park and dozed off in his truck. He had a "vague memory" of being at the park, but he could not remember why he was there. Appellant explained he also had a "dream memory" of sitting on the curb "right across almost from Jane Doe's house" where his old boss lived. He explained, "I was sitting on the curb ... I have a memory of sitting on the curb just looking at [the boss's] house, that's all I remember." Appellant also had a "very, very brief" memory of "cuddling up with someone in bed and trying to get warm." Then he remembered starting to wake up, "starting to become more conscious [of his] surroundings[.]" Appellant remembered talking to someone and "fooling around ... some sort of sexual foreplay[.]"

Appellant recalled being orally copulated and being aroused, but he did not know who he was with or where he was. According to appellant, it was "very, very weird. Very, very strange." As appellant explained, "I knew this old familiar feeling, so I didn't freak out or nothing, because I had woke up slowly." Appellant did not remember talking to Doe, but he did remember she mentioned her name, said she had to go to work, and that she asked him to leave. Appellant left Doe's house through the back door. He walked to the river, leaving his truck parked near Doe's house. He tried to remember what happened, but he could not. This "memory lapse" was a "familiar feeling" to appellant.

4

About 30 minutes later, appellant went back to get his truck and saw law enforcement officers. He was afraid, "kinda [sic ] freaking out" because he "couldn't remember what happened[.]" He fell asleep in the bushes. When he woke up, the police were gone. He found his truck and drove away. Shortly thereafter, the police stopped appellant and took him to the police station, where Officer McCarthy interviewed him. Appellant was afraid to tell Officer McCarthy he did not remember what happened with Doe, so he made up a story by "fill[ing] in the gaps" in his memory. At first, appellant thought Doe was "trying to set [him] up" because he said something that "hurt her feelings" but—after reading his statements to the police and the police reports—he realized he had been sleepwalking during the incident.

On cross-examination, appellant testified he pleaded no contest to a prowling charge in the 2008 incident with Raina. Appellant admitted lying during his police interview; he claimed he was embarrassed he did not know what happened with Doe, so he made up a story.[4] Later, he claimed he was confused and upset during the police interview and was "having anxiety attacks." Appellant also admitted he lied to his mother and his daughter about the incident. He conceded he told his mother he was very enthusiastic about the defense of unconsciousness, which he had discovered while performing legal research in jail. He told his daughter he "need[ed] more of a defense." In addition, appellant told his daughter, his girlfriend, his brother, and his mother to come to court and testify about his sleepwalking episodes.

> Footnote 4:  In an August 2010 letter to a jail inmate, appellant claimed he didn't force anything on "this chick" and stated Doe said he raped her as "[r]evenge" because he had called her various insulting names during the incident. He claimed the criminal charges would "not hold up" because of Doe's "alcohol level" and explained, "I took advantage of a drunk chick. That's all." On cross-examination, appellant testified he did not remember writing the letter, but acknowledged hand-writing a petition for writ of habeas corpus. The prosecutor compared appellant's handwriting in the letter to the writ petition. Appellant admitted he lied in the writ petition.

B. Dr. Kin Yuen, M.D.'s Testimony

Dr. Yuen testified for the defense as an expert in "medicine and sleep [ ] disorders." After interviewing appellant and conducting a limited physical examination in jail, she determined appellant had a severe obstructive sleep apnea. Dr. Yuen estimated appellant stopped breathing 20–30 times a night. According to Dr. Yuen, sleep apnea can precipitate a sleepwalking episode. Factors precipitating a sleepwalking episode also include use of prescription medications and illegal drugs, and depression. Appellant told Dr. Yuen he smoked marijuana, but did not tell her he had tested positive for methamphetamine on April 29, 2010.

Appellant told Dr. Yuen he had a history of sleepwalking and described the sleepwalking episodes. According to Dr. Yuen, people

can engage in atypical sexual behavior while sleepwalking. A person is unconscious of his actions while sleepwalking and, upon awakening, can "feel very disoriented" and "confused because they don't realize how they got there." This confusion can last for up to 30 minutes. A sleepwalker may try to explain or fill in memory gaps if he fears what he may have done while sleepwalking.

Dr. Yuen testified appellant's account of the incident was consistent with someone who is sleepwalking. She explained, "[a]s a physician generally we give the patient [the] benefit of the doubt, so the question is whether his story is possible, and that's how I render my opinion regarding [ ] whether that was a possibility or not."

C. Other Testimony

Robert Hansen, a supervisor for the Napa Department of Parks and Recreations Services, testified about a 2004 or 2005 incident when a disheveled appellant appeared at work at 4:40 a.m., several hours before his shift began. Appellant was not wearing work clothing and seemed confused and disoriented; he said he was building a bomb shelter. Hansen did not know if appellant was sleepwalking or under the influence of drugs. Appellant's older brother testified appellant sleepwalked from age one or two until age six or seven. Appellant's brother also testified appellant had "amnesia"—he would not remember sleepwalking the next day.

Appellant's 22–year–old daughter testified that when she lived with appellant in 2007, he had sleeping issues: he had difficulty sleeping, woke up frequently at night, and sometimes woke up, walked out to the living room "and he was kind of like just awake but not awake[.]" Appellant's daughter recalled a 2005 incident when appellant seemed to be under the influence of drugs but could have been sleepwalking. When she visited him in jail, appellant told his daughter he had been sleepwalking when he went to Doe's house. He also told his daughter Doe orally copulated him, that he "stuck [his] fingers in her [,]" and that had methamphetamine in his system the day of the incident.

Appellant's ex-girlfriend, Amanda, testified she lived with appellant for about a year and a half. During that time, appellant had irregular sleep patterns and slept three to four hours a night but Amanda did not recall appellant sleepwalking or experiencing memory lapses. According to Amanda, appellant was "[a]bsolutely not" capable of sexually assaulting Doe. Amanda talked to appellant on the phone on the morning of April 29, 2010 and he cried, mumbled, and told her he missed her and wanted to reconcile. He also told Amanda he had consensual sex with a drunk woman he met downtown. During a conversation with appellant while he was in custody, appellant told Amanda his defense had changed: he now claimed he was sleepwalking during the incident with Doe and did not remember certain things about the incident. Amanda conceded appellant's sleepwalking defense was different than what appellant originally told her about having consensual sex with an intoxicated woman he met downtown.

Cal. Ct. App. Opinion at 2-9.

**United States District Court**
For the Northern District of California

1  Following the jury trial in October 2011, Mr. Boyce was convicted of forcible rape,

2  forcible oral copulation, sodomy by use of force, anal or genital penetration by a foreign object by

3  force and violence, and first degree residential burglary.  On November 15, 2011, Mr. Boyce was

4  sentenced to 50 years to life in prison.

5  Mr. Boyce appealed and filed a petition for writ of habeas corpus in the California Court of

6  Appeal.  After the appeal and habeas petition were briefed, the California Court of Appeal

7  affirmed the conviction in a reasoned opinion and summarily denied the petition for writ of habeas

8  corpus on January 27, 2014.  Mr. Boyce filed a petition for review and petition for writ of habeas

9  corpus in the California Supreme Court.  The California Supreme Court summarily denied the

10  petition for review on April 9, 2014 and summarily denied the petition for writ of habeas corpus

11  on May 21, 2014.

12  Mr. Boyce then filed this action.  His federal petition for writ of habeas corpus presents

13  four claims: (1) counsel provided ineffective assistance in failing to correctly advise Mr. Boyce

14  regarding a plea bargain; (2) the prosecution's presentation of certain evidence during rebuttal,

15  rather than during its case-in-chief, violated Mr. Boyce's right to due process; (3) the jury

16  instructions on the sex crimes violated his rights to due process and trial by jury; and (4) the

17  prosecutor's comment during closing argument that equated an abiding conviction with a "gut

18  feeling" violated Mr. Boyce's right to due process.

19  ### III.   JURISDICTION AND VENUE

20  This Court has subject matter jurisdiction over this action for a writ of habeas corpus under

21  28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition

22  concerns the conviction and sentence of a person convicted in Napa County, California, which is

23  within this judicial district.  28 U.S.C. §§ 84, 2241(d).

24  ### IV.   STANDARD OF REVIEW

25  This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

26  custody pursuant to the judgment of a State court only on the ground that he is in custody in

27  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

28  The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254

to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803.  The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence.  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016).  Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default and applies to decisions on the merits.  *Barker*, 423 F.3d at 1092 n.3.  In other words, when the last reasoned decision is a decision on the merits, the habeas

**United States District Court**
For the Northern District of California

1  court can look through later summary denials to apply § 2254(d) to the last reasoned decision.

2        Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a

3  federal claim has been presented to a state court and the state court has denied relief, it may be

4  presumed that the state court adjudicated the claim on the merits in the absence of any indication

5  or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

6  When the state court has denied a federal constitutional claim on the merits without explanation,

7  the federal habeas court "must determine what arguments or theories supported or . . . could have

8  supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

9  could disagree that those arguments or theories are inconsistent with the holding in a prior

10  decision of [the U.S. Supreme] Court."  *Id.* at 102.

11  **V.   DISCUSSION**

12  A.    Claim of Ineffective Assistance of Counsel Regarding Plea Bargain

13        Mr. Boyce claims that counsel gave him incorrect information about the maximum

14  sentence he faced if he rejected the prosecution's plea offer and went to trial.  The prosecution

15  offered a plea bargain of a 24-year sentence in exchange for a guilty plea to three of the charged

16  sex offenses.  Mr. Boyce contends that he rejected that plea offer after being incorrectly advised

17  by defense counsel that he faced a maximum sentence of 25 years to life in prison instead of 100

18  years to life in prison.

19        1.    Background

20        The charging information included an allegation under California Penal Code § 667.61(a)

21  and (d) as to each of the four sex offenses.  Section 667.61 is not a sentence enhancement and is

22  instead an alternative sentencing provision, authorizing a sentence of 25 years to life for specified

23  sex crimes.  CT 225. Consecutive sentences are mandatory if the offenses involve the same victim

24  on separate occasions; otherwise, the decision whether to impose consecutive or concurrent

25  sentences is discretionary.  Cal. Penal Code § 667.61(i); *see* Cal. Penal Code § 667.6.  "Separate

26  occasions" occur when the defendant had a reasonable opportunity to reflect between the offenses

27  and nevertheless resumed the sexual assault.  Cal. Penal Code § 667.6(d).

28        The prosecutor made a plea offer of 24 years to Mr. Boyce if he pled guilty to three sex

counts.  This offer was communicated verbally by the prosecutor to Gregory Galeste, the public defender representing Mr. Boyce.  Docket No. 16-7 at 14.  Mr. Galeste in turn told Mr. Boyce that the prosecution had offered to permit him to plead guilty to three sex counts in exchange for a sentence of 24 years.

There are some discrepancies in Mr. Galeste's and Mr. Boyce's recollection of their communications about the upper limits of his exposure if he went to trial and was convicted. Those differing accounts were in the declarations presented to the California Court of Appeal.

Mr. Galeste declared that he did not recall whether he specifically told Mr. Boyce that he faced a potential maximum sentence of 100 years in prison, but did have a specific recollection of telling Mr. Boyce that he would be in prison for the rest of his life if convicted.  Mr. Galeste declared:

> I specifically recall on several occasions advising Mr. Boyce that as charged, if convicted of a first degree burglary and also convicted of any one of the sex counts that he would be sentenced to twenty five years to life.  I also advised Mr. Boyce that if he was convicted of even one of the sex counts it would be a life sentence *and that he would never be released from prison.*  I also recall Mr. Boyce asking me about the Sexually Violent Predators (SVP) Act.
>
> Mr. Boyce initially advised me that the most he would consider accepting was eight (8) years.  He subsequently advised me verbally and in writing that he was reducing what he would accept, that the only offer he would accept would be probation, credit for time served and possibly a suspended sentence.  He advised me he would not plead to any sex crimes and that if the D.A. was unwilling to make this offer he did not want to discuss it further with me and he wanted to have a trial.

Docket No. 16-3 at 62-63 (emphasis added).[1]

Mr. Boyce declared that he had earlier on received a copy of the complaint and charging information, and that Mr. Galeste relayed the prosecutor's offer of a 24-year term if he pled guilty

---

[1] Attached to Mr. Galeste's declaration is Mr. Boyce's handwritten note setting out in writing that he was reducing what he would accept.  Docket No. 16-3 at 64 (Mr. Boyce's note stated, "I'm going to list all plea options that I am willing to bargain with.  If the D.A. is not willing to go along these lines, I do not want to discuss anything else. . .," followed by a list of agreeable terms, followed by "otherwise I'm going for the whole Burrito!!!").  Mr. Boyce declares that his list of acceptable terms was made later in time, after "new defense evidence arose."  Docket No. 16-3 at 51.

United States District Court
For the Northern District of California

1   to three sex counts.  Mr. Boyce further declared:

2        I understood, based on my conversations with Mr. Galeste and the
         paperwork which contained my charges (the complaint and the
3        information), that the maximum sentence I was facing was 25 years
         to life.  Mr. Galeste told me that was the sentence I could get for the
4        special 667.61 allegation.  I told Mr. Galeste that if my choices were
         24 years or 25 years to life, I would fight the case and go to trial.  It
5        did not make sense to me to plead guilty in that situation.  Mr.
         Galeste agreed with me and we presented a counter offer of eight (8)
6        years.  Mr. Galeste came back later and told me that Ms. Rollins
         rejected our counter offer.

7
         . . .
8
         I never knew, however, when the prosecution made the 24-year plea
9        offer, that I was actually facing 100 years to life on the 667.61
         charge, not 25 years to life.  Mr. Galeste never told me that the 25
10       years for the 667.61 charge could apply to each of the four counts of
         sex crimes.

11

12   Docket No. 16-3 at 51.  Mr. Boyce declared that he did not learn until the day after the jury verdict

13   that he was actually facing a possible 100-years-to-life sentence under § 667.61.  On that day, Mr.

14   Galeste told Mr. Boyce that he (Galeste) had looked into it and said, "'It looks like they could give

15   you four 25-years-to-life sentences.'"  Docket No. 16-3 at 52.  Mr. Boyce further declared that,

16   had he known he was facing a 100-years-to-life sentence, he would not have rejected the

17   prosecutor's offer of 24 years.  *Id.*

18        Mr. Boyce presented declarations from his daughter and girlfriend with his habeas reply

19   brief in state court.  His daughter, Amanda Boyce, declared that Mr. Galeste told her during a

20   pretrial meeting that Mr. Boyce was facing a maximum sentence of 25 years to life and she was

21   shocked to learn after the jury trial that Mr. Boyce could receive more than one sentence of 25

22   years to life.  Docket No. 16-5 at 8.  She also declared that Mr. Boyce told her that he wanted to

23   avoid a trial if possible, that he was interested in a plea bargain if offered a "fair deal," and did not

24   believe the 24-year offer was fair.  *Id.* at 9.  Mr. Boyce's girlfriend, Amanda Frost, declared that

25   Mr. Galeste told her that, if convicted of all charges, Mr. Boyce could go to prison for 25 years to

26   life, and that Mr. Boyce told her the plea offer "did not seem to be much of a deal."  Docket No.

27   16-5 at 11-12.

28        The California Court of Appeal summarily rejected Mr. Boyce's claim that he received

**United States District Court**
For the Northern District of California

11

ineffective assistance of counsel with regard to the plea offer.  Thus, the federal habeas court

"must determine what arguments or theories supported or . . . could have supported, the state

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

those arguments or theories are inconsistent with the holding in a prior decision of [the U.S.

Supreme] Court."  *Harrington,* 562 U.S. at 102.

2.  <u>Analysis</u>

The Sixth Amendment's right to counsel guarantees not only assistance, but effective

assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for

judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied upon as having produced a just

result.  *Id.*  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

must establish two things.  First, he must demonstrate that counsel's performance was deficient

and fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id*

at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance,

i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability

sufficient to undermine confidence in the outcome.  *Id.*

A criminal defendant is entitled to effective assistance of counsel during plea negotiations.

*Lafler v. Cooper,* 132 S. Ct. 1376, 1384 (2012).  To satisfy the prejudice prong of *Strickland* when

a defendant has rejected a plea offer, the "defendant must show the outcome of the plea process

would have been different with competent advice."  *Id.*  That is, the defendant "must show that,

but for the ineffective advice of counsel there is a reasonable probability that the plea offer would

have been presented to the court (i.e., that the defendant would have accepted the plea and the

prosecution would not have withdrawn it in light of intervening circumstances), that the court

would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms

would have been less severe than under the judgment and sentence that in fact were imposed."  *Id.*

at 1385.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

**United States District Court**
For the Northern District of California

1    counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).  The "question

2    is not whether counsel's actions were reasonable.  The question is whether there is any reasonable

3    argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

4         Here, the California Court of Appeal reasonably could have concluded that Mr. Boyce

5    failed to meet his burden to show that counsel's performance was deficient.  Counsel did inform

6    Mr. Boyce of the maximum sentence he could serve – life in prison – even if he (as Mr. Boyce

7    claims) did not correctly advise him that he could receive a 100-years-to-life sentence rather than a

8    25-years-to-life sentence.  Counsel also informed Mr. Boyce that, if convicted of burglary and any

9    of the sex offenses, he would never get out of prison.  Thus, even if trial counsel did not

10    specifically inform Mr. Boyce that there was a possibility he could be sentenced to a prison term

11    of 100 years to life, counsel made it clear that Mr. Boyce would spend his entire life in custody if

12    convicted of just one sex crime and the burglary.  Mr. Boyce does not disagree that counsel told

13    him that he would spend his life in prison if convicted.  While a 25-years-to-life sentence is not the

14    same as a 100-years-to-life or life-without-parole sentence, the California Court of Appeal

15    reasonably could have determined that Mr. Galeste was giving a realistic prediction to his client of

16    lifelong custody based on the parole prospects for violent sex offenders and the possibility for

17    future commitment under California's Sexually Violent Predators Act (even if let out of prison

18    after serving his sentence) due to the violent sex offenses against Jane Doe.  The state court of

19    appeal reasonably could have relied on this information to find that there was not deficient

20    performance because the net effect of counsel's advice was to alert the client to the possibility that

21    he would be in prison for life if he did not accept the plea offer and was convicted.

22         The California Court of Appeal also could have used different reasoning to find that Mr.

23    Galeste's advice was not deficient.  That is, the court could have seen Mr. Galeste's advice as a

24    reasonable prediction of a likely worst-case scenario.  It was far from clear that Mr. Boyce would

25    receive a 100-years-to-life sentence.  California Penal Code section 667.61 allowed for separate

26    25-years-to-life sentences if the defendant committed the sex acts on "separate occasions," but that

27    outcome was unlikely because Mr. Boyce's conduct did not appear to involve sex acts on

28    "separate occasions."  Under section 667.6(d), "[i]n determining whether crimes against a single

**United States District Court**
For the Northern District of California

victim were committed on separate occasions under this subdivision, the court shall consider

whether, between the commission of one sex crime and another, the defendant had a reasonable

opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive

behavior."  Counsel reasonably could have believed a 100-years-to-life sentence was highly

unlikely for the four sex offenses that were committed within a span of about a half-hour, during

which the victim was sexually assaulted in her bedroom and during which there was no pause in

the criminal episode.  Indeed, when the trial court eventually sentenced Mr. Boyce to two

consecutive 25-years-to-life terms and two concurrent 25-years-to-life sentences, the judge's

comments indicate the choice was based less on the "separate occasions" language of section

667.6(d) and more on other aggravating circumstances present with this case and this defendant.[2]

*See* RT 3667-68.  The state appellate court reasonably could have found that counsel did not

engage in deficient performance when he predicted that a 25-years-to-life sentence was the likely

maximum sentence Mr. Boyce faced.

      The California Court of Appeal also reasonably could have concluded that Mr. Boyce had

failed to satisfy *Strickland's* prejudice prong.  To satisfy that prong, Mr. Boyce had to show that, if

counsel had specifically told him that the potential maximum sentence was 100 years to life in

prison, there was a reasonable probability that he would have accepted the 24-year offer.  *Lafler*,

132 S. Ct. at 1384.  Mr. Boyce offered no argument to the California Court of Appeal or this court

disputing that Mr. Galeste told him that he (Boyce) would spend his entire life in prison if

convicted of one sex crime and the burglary.  Mr. Boyce does not explain how or why it would

have made a difference to him if Mr. Galeste told him that he faced a 100-years-to-life sentence

---

[2] At sentencing, the judge agreed with the defense that the crimes occurred close in time.  On the other hand, the judge thought there was extreme abuse of the victim and agreed with the prosecutor that Mr. Boyce was stalking the victim, that Mr. Boyce had planned and prepared and took advantage of a vulnerable victim, and that Mr. Boyce earlier had stalked another woman.  RT 3667-68.

      The eventual sentence a defendant receives is not determinative as to whether counsel's performance was deficient or not.  Here, however, the comments at sentencing provide some support for a determination that counsel's prediction of 25-to-life was not an unreasonable prediction and negated the argument that it was counsel's ignorance of California Penal Code § 667.6 sentencing scheme that caused him to tell his client that the maximum sentence was 25-to-life.

**United States District Court**
For the Northern District of California

1  instead of telling him he would never be released from prison if he was convicted of at least one

2  sex crime and a burglary.  Under either scenario, Mr. Boyce would be in prison for life.  The

3  California Court of Appeal reasonably could have determined that there was no reasonable

4  probability that Mr. Boyce would have accepted the plea offer of 24 years even if specifically told

5  that the maximum sentence was *100* years to life, and therefore the prejudice prong of *Strickland*

6  had not been satisfied.

7      Because 28 U.S.C. § 2254(d) applies to this claim, the question is whether there is "any

8  reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 562

9  U.S. at 105.  There is a reasonable argument that counsel satisfied *Strickland*'s deferential

10  standard because Mr. Boyce refused the plea offer after receiving the essential information about

11  the maximum length of the sentence (i.e., life) and that he would in fact be in custody for the rest

12  of his life if convicted.  The California Court of Appeal's rejection of the ineffective assistance of

13  counsel claim thus passes the deferential standard of § 2254(d).  Mr. Boyce is not entitled to

14  habeas relief on this claim.

15  B.    Introduction of Petitioner's Police Interview In Rebuttal

16      Mr. Boyce contends that his right to due process was violated when the prosecution

17  introduced Mr. Boyce's videotaped interview with police in the prosecution's rebuttal case rather

18  than during the prosecution's case-in-chief.

19      Mr. Boyce was interviewed by police officer McCarthy several hours after Jane Doe

20  reported the rape.  The prosecutor chose not to introduce the videotaped interview during her case-

21  in-chief and instead announced during the defense case that she planned to introduce the videotape

22  in rebuttal.  Defense counsel objected on the grounds that the videotape should have been

23  presented in the prosecutor's case-in-chief and that the videotape was not impeachment material

24  because Mr. Boyce already had admitted during his testimony that he lied to police in the

25  videotaped interview.  The prosecutor responded that she was under no obligation to introduce the

26  videotape in the prosecution's case-in-chief, and that the jury should be permitted to observe Mr.

27  Boyce's demeanor during the interview to determine whether he was actually confused as a result

28  of his alleged unconsciousness.  The trial court allowed the videotape to be played for the jury

**United States District Court**
For the Northern District of California

1    during the prosecution's rebuttal.  The trial court reasoned that the videotape was appropriate

2    rebuttal material and, even though the interview took place four or five hours after the crime, it

3    was "still close enough" in time to have some relevance to his unconsciousness defense.

4         On appeal (as in his federal habeas petition), Mr. Boyce argued that the videotape was not

5    admissible under state law as rebuttal evidence and therefore its admission violated his federal

6    right to due process.  The California Court of Appeal rejected Mr. Boyce's claim that the

7    admission of the videotape violated his rights under California law and his federal right to due

8    process.  Cal. Ct. App. Opinion at 9-13.

> As our high court has explained, "'[i]f evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be.' [Citation.] '[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' [Citation.] [¶] The reasons for the restrictions on rebuttal evidence are 'to (1) ensure the orderly presentation of evidence so that the trier of fact is not confused; (2) to prevent the prosecution from "unduly magnifying certain evidence by dramatically introducing it late in the trial;" and (3) to avoid "unfair surprise" to the defendant from sudden confrontation with an additional piece of crucial evidence.' [Citations.] [¶] 'The decision to admit rebuttal evidence over an objection of untimeliness rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 761 (*Mayfield* ); *People v. Young* (2005) 34 Cal.4th 1149, 1199 (*Young*); see also § 1093, subd. (d) [procedural order for criminal trials].)

> Appellant contends his statements during the interview "tended to prove his guilt" and "constituted admissions which properly belonged in the prosecution's case-in-chief." We disagree. Throughout the interview, appellant denied raping Doe. He claimed the encounter was consensual, that it was initiated by Doe, and that she claimed he raped her to retaliate against him. Evidence of the police interview became relevant on rebuttal because appellant testified and asserted an affirmative defense of unconsciousness, which was "'not implicit in his general denial of guilt.'" (*Young, supra*, 34 Cal.4th at p. 1199, quoting *People v. Carter* (1957) 48 Cal.2d 737, 753–754 (*Carter*).) The police interview was relevant for several reasons: (1) to impeach appellant's trial testimony that he was unconscious during the incident; (2) to impeach appellant's testimony that he was confused and upset during the police interview; (3) to impeach defense expert Dr. Yuen's testimony that appellant was prone to sleepwalking; and (4) to demonstrate appellant was a liar. Testimony "that repeats or fortifies a part of the

prosecution's case that has been impeached by defense evidence may properly be admitted in rebuttal." (*Young, supra,* 34 Cal.4th at p. 1199.)

. . .

In any event, any error was undoubtedly harmless under either the federal or state standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836.) Evidence of appellant's guilt was overwhelming: appellant had two prior stalking incidents and had pleaded no contest to prowling on a woman's property. At trial, Doe testified appellant forcibly raped, sodomized, and digitally penetrated her, and that he forced her to orally copulate him. The physical evidence—including the SART examination results and the DNA evidence—corroborated Doe's testimony. Moreover, and as appellant concedes, the jury heard the bulk of his statements during the interview on cross-examination. Finally, the evidence supports a jury conclusion that appellant's sleepwalking defense was completely contrived and not credible. Any error in permitting the prosecution to introduce the police interview on rebuttal was harmless under any standard.

Cal. Ct. App. Opinion at 12-14.

The California Court of Appeal did not separately discuss the federal due process claim. The federal constitutional claim is presumed to have been adjudicated on the merits, even absent a discussion of it.  *See Harrington*, 562 U.S. at 99-100.  When, as here, the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Id.* at 102.

Mr. Boyce has not identified, nor has this Court located, any case from the U.S. Supreme Court holding that the U.S. Constitution requires any particular sequence of the presentation of evidence at a criminal trial.  His claim rests on a general statement in *Hicks v. Oklahoma*, 447 U.S. 343 (1980), that he contends imposes a federal constitutional duty on state courts to comply with state laws.  *Hicks* was cited by Mr. Boyce in his state court appeal brief for the general legal proposition that the deprivation of a State law right violates a criminal defendant's federal right to due process.

The Supreme Court observed in *Hicks* that a failure to follow state law might implicate the

17

United States District Court
For the Northern District of California

1   criminal defendant's federal right to due process. *Id.* at 346.  The facts of *Hicks* are not at all like

2   those in Mr. Boyce's case.  In *Hicks*, Oklahoma law provided that a convicted defendant was

3   entitled to have his punishment fixed by the jury.  Hicks' jury had been instructed, in accordance

4   with a habitual offender statute then in effect, that the jury had to assess the punishment at 40

5   years imprisonment if it found defendant guilty.  *See Hicks*, 447 U.S. at 344-45.  The jury

6   followed the instruction, imposing the mandatory 40-year term when it returned a guilty verdict.

7   *Id.* at 345.  Later, the habitual offender statute was declared unconstitutional in a separate case,

8   and that led Hicks to try to set aside his sentence.  The court of appeal rejected Hicks' effort to

9   have his sentence set aside, reasoning that he was not prejudiced by the impact of the

10  unconstitutional habitual offender statute because his sentence was within the range of punishment

11  that could have been imposed. *Id.*  The Supreme Court determined that this analysis was

12  erroneous.  The Court explained that a convicted defendant was entitled under Oklahoma law to

13  have his punishment fixed by the jury and that, without the unconstitutional statute, the jury could

14  have imposed any sentence of not less than ten years, so it was incorrect to say that the instruction

15  that directed a 40-year sentence did not prejudice the defendant. *Id.* at 345-46.  The Court next

16  rejected the argument that this was only a state law error:  "It is argued that all that is involved in

17  this case is the denial of a procedural right of exclusively state concern.  Where, however, a State

18  has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not

19  correct to say that the defendant's interest in the exercise of that discretion is merely a matter of a

20  state procedural law.  The defendant in such a case has a substantial and legitimate expectation

21  that he will be deprived of his liberty only to the extent determined by the jury in the exercise of

22  its statutory discretion, . . . and that liberty interest is one that the Fourteenth Amendment

23  preserves against arbitrary deprivation by the State." *Id.* at 347.

24        It is extremely doubtful that *Hicks* could support habeas relief for the sort of alleged error

25  that occurred here.  To do so would require extending *Hicks* from the sentencing context to the

26  entirely different context of the order of presentation of evidence at trial.  A state court's failure to

27  extend a Supreme Court rule to a new context does not support relief under § 2254(d)(1). "Section

28  2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this

**United States District Court**
For the Northern District of California

1    Court's precedent; it does not require state courts to extend that precedent or license federal courts

2    to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (in capital

3    case, not objectively unreasonable for state court not to extend to penalty phase constitutional rule

4    that applies to guilt phase).

5           Even assuming arguendo that *Hicks* provides clearly established federal law from the U.S.

6    Supreme Court that a criminal defendant's federal right to due process rights is violated by the

7    state court's failure to follow state law, Mr. Boyce's claim fails because the state court did not fail

8    to follow state law in allowing the admission of the videotape during the prosecution's rebuttal

9    case. The California Court of Appeal determined that there was not a failure to follow state law:

10   under California law, the prosecution was not obligated to present the videotape in its case-in-

11   chief because the videotape could be considered exculpatory in that Mr. Boyce told the officer the

12   sexual encounter was consensual; the damaging nature of the videotape only became apparent

13   when Mr. Boyce presented a defense of unconsciousness due to sleepwalking, and the videotape

14   therefore was appropriate for the prosecution's rebuttal. According to the California Court of

15   Appeal, the videotape evidence was properly introduced in the prosecution's rebuttal case after

16   Mr. Boyce testified and asserted an affirmative defense of unconsciousness, which was not

17   implicit in his general denial of guilt. State law therefore did not require that the videotape be

18   presented only in the prosecution's case-in-chief. A state court's interpretation of state law,

19   including one announced on direct appeal of the challenged conviction, binds a federal court

20   sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S.

21   624, 629 (1988). This court is bound by the California Court of Appeal's determination that

22   California law did not require that the videotape be presented only in the prosecution's case-in-

23   chief. There was no *Hicks*-type due process violation because there was no failure to follow state

24   law.

25          Moreover, even if a constitutional error occurred, habeas relief would not be available

26   unless the error "'had substantial and injurious effect or influence in determining the jury's

27   verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*,

28   328 U.S. 750, 776 (1976)). When, as here, the state court has found any error was harmless, relief

**United States District Court**
For the Northern District of California

is not available for the error "unless *the harmlessness determination itself* was unreasonable." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (emphasis in original).  In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement**.**" *Id.* (quoting *Harrington v. Richter*, 562 U.S. at 103).

The California Court of Appeal's determination that any assumed error in allowing the videotape as rebuttal evidence was harmless error was not contrary to or an unreasonable application of clearly established federal law.  As the California Court of Appeal noted, the evidence of Mr. Boyce's guilt was "overwhelming."  Cal. Ct. App. Opinion at 14.  That evidence included Jane Doe's testimony that Mr. Boyce forcibly raped, sodomized and digitally penetrated her, and that he forced her to orally copulate him.  Jane Doe's account was corroborated by the SART examination evidence that Jane Doe had injuries to her mouth consistent with blunt force trauma, a bleeding laceration on her vagina, and multiple lacerations on her anus -- injuries the SART nurse concluded were consistent with Jane Doe's description of being sexually assaulted. Jane Doe's testimony that it had been a forcible sexual assault also was supported by her frightened 9-1-1 call and her "visibly shaken" appearance to a police officer who arrived in response to that call.  Cal. Ct. App. Opinion at 14.  The jury also had heard that Mr. Boyce had two prior stalking incidents and had pleaded no-contest to prowling on a woman's property.  Mr. Boyce does not dispute that, before the videotape was introduced in rebuttal, the jury already heard the bulk of his statements from the police interview during Mr. Boyce's cross-examination. And the jury had heard from Mr. Boyce that he had lied repeatedly about the incident, not only lying to the police but also to his mother, daughter and ex-girlfriend.  Moreover, with or without the videotape being played for the jury, the unconsciousness defense was implausible, especially because Mr. Boyce did not raise it until after he realized his consent defense was weak and after he had done some research into a defense of unconsciousness.

The very short jury deliberations suggest the jury did not struggle with the evidence or Mr. Boyce's guilt. "'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'"  *United States v. Lopez*, 500 F.3d 840, 846 (9th

1  Cir. 2007) (quoting *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see,*

2  *e.g., id.* at 846 (2.5-hour jury deliberations in illegal reentry case suggested any error in allowing

3  testimony or commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269

4  F.3d at 1036 (4-day jury deliberations supported inference that impermissible evidence affected

5  deliberations).  Here, the jury deliberated less than two-and-a-half hours after a six-day trial before

6  returning with a verdict.  *See* CT 148-149; RT 3432.

7        The state appellate court's harmlessness determination was not "'so lacking in justification

8  that there was an error well understood and comprehended in existing law beyond any possibility

9  for fairminded disagreement.'"  *Davis v. Ayala*, 135 S. Ct. at 2199 (quoting *Harrington*, 562 U.S.

10  at 103).  Mr. Boyce is not entitled to the writ on this claim.

11        In his traverse, Mr. Boyce argues that the same failure to follow state law on the

12  presentation of evidence amounted to prosecutorial misconduct.  The prosecutorial misconduct

13  argument fails for the same reason the *Hicks* argument fails: there was not a failure to follow state

14  law.  Mr. Boyce is not entitled to the writ on this claim.

15  C.  Jury Instructions On The Sex Crimes

16        Mr. Boyce contends that the jury instructions on the sex crimes violated his rights to due

17  process and trial by jury because the instructions did not adequately elaborate on a particular point.

18  As to each of the four sex offenses, the instructions required the prosecution to prove (first) that

19  the sex act occurred; (second) that he and the victim were not married; (third) that there was a lack

20  of consent by the victim; and (fourth) that the defendant accomplished the act by either using force

21  or fear, or alternatively, by making threats of bodily harm.  Mr. Boyce challenges the fourth part

22  of the instructions, arguing that the instructions allowed the jury to find him guilty on the

23  alternative path that he made future threats of bodily harm without requiring the jurors to also find

24  a reasonable possibility that he would carry out the threat. The state appellate court rejected the

25  claim on the ground that any error was harmless, given the overwhelming evidence that Mr. Boyce

26  had used direct force on the victim and threats of immediate harm to accomplish the sexual

27  assaults.

28

United States District Court
For the Northern District of California

1.   Background

The trial court gave the following instruction for the rape charge:

> To prove the defendant guilty of [rape by force], the People must prove that, one, defendant had sexual intercourse with a woman; two, he and the woman were not married to each other at the time of the intercourse; three, the woman did not consent to the intercourse; and four, *the defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else.*
>
> Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis.  Ejaculation is not required.
>
> To consent, a woman must act freely and voluntarily and know the nature of the act.
>
> Intercourse is accomplished by force if a person uses enough physical force to overcome the woman's will.  *Duress means a direct or implied threat of force, violence, danger or retribution that would cause a reasonable person to do something that she would not otherwise do.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the woman's age, and her relationship to the defendant.  Retribution is a form of payback or revenge.*  Menace means a threat, statement or act showing an intent to injure someone. Intercourse is accomplished by fear if the woman actually and -- if the woman is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knew of her fear and takes advantage of it.
>
> The defendant is not guilty of rape if he actually believed that the woman consented to the intercourse.  The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the person or the woman consented.  If the People do not meet this burden, you must find the defendant not guilty.

RT 3417-18 (emphasis added).[3]

Mr. Boyce's argument here confusingly mixes together discussion of the pattern instruction, CALCRIM 1000, and the instruction actually given at his trial.  CALCRIM 1000 (the rape instruction) has alternative provisions for the force/fear portion of the instruction, but not all

---

[3] The instructions for all four sex crimes -- rape, oral copulation, sodomy, and sexual penetration with a foreign object -- had similar requirements that the defendant accomplished the act with force or fear, etc.  *See* CALCRIM 1000, 1015, 1030, 1045; CT 202-209.  For ease of understanding, the Court discusses only the rape instruction, although the same analysis applies to all four sex crimes.

those alternatives were included in the instruction given at Mr. Boyce's trial.[4]

Mr. Boyce argued in the California Court of Appeal (as here) that the jury might have convicted him based on a future threat to retaliate without also finding that there was a reasonable possibility that he would carry out the threat. He reasons thusly: Under California Penal Code section 261(a)(6), a rape may occur "[w]here the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat." The jury instructions given at his trial (a) required that the jury find that the "defendant accomplished the intercourse by force, violence, duress," etc. to find Mr. Boyce guilty; (b) defined "duress" as "a direct or implied threat of force, violence, danger or retribution that would cause a reasonable person to do something that she would not otherwise do"; and (c) defined "retribution" as a form of payback or revenge."

---

[4] CALCRIM 1000 has the following language options that correspond to the first italicized portion of the block quote in the text.

The defendant accomplished the intercourse by

*<Alternative 4A—force or fear>*

[force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else.]

*<Alternative 4B—future threats of bodily harm>*

[threatening to retaliate in the future against the woman or someone else when there was a reasonable possibility that the defendant would carry out the threat. A threat to retaliate is a threat to kidnap, falsely imprison, or inflict extreme pain, serious bodily injury, or death.]

*<Alternative 4C—threat of official action>*

[threatening to use the authority of a public office to incarcerate, arrest, or deport someone. A public official is a person employed by federal, state, or local government who has authority to incarcerate, arrest, or deport. The woman must have reasonably believed that the defendant was a public official even if he was not.]

CALCRIM 1000. Only Alternative 4A was read at Mr. Boyce's trial, but his argument centers on a fact pattern that might prompt the use of Alternative 4B. A problem in an instruction not given at his trial would not support relief for a habeas petitioner. In other words, the federal habeas court does not supervise CALCRIM wording, and instead only decides if the instruction actually given (whether it be from CALCRIM or custom-made) resulted in a violation of that criminal defendant's constitutional rights.

23

1    Using these parts of the instruction, he argues that the term "retribution" is similar in meaning to

2    "retaliation" so the jury might have believed the phrase "retribution," standing alone, included

3    threats of future retaliation.  Thus, according to Mr. Boyce, to fully cover the section 261(a)(6)

4    theory, the trial court should have added clarifying language explaining either (a) that future

5    retaliation was not included in this case or (b) that future retaliation must also include a reasonable

6    possibility that the defendant would carry out the threat.

7            The California Court of Appeal did not discuss whether the jury instructions were

8    erroneous and instead rejected the claim on the basis that, even if the instructions were assumed to

9    be erroneous, any error was harmless.

10           Assuming the instructions at issue were erroneous, we conclude any
             error was harmless beyond a reasonable doubt. (*Chapman* [*v.
11           California*], 386 U.S. [18, 24 (1967)].) The evidence
             overwhelmingly established appellant used direct force and violence
12           and threats of immediate harm to accomplish the sex acts. Appellant
             slapped Doe; as he did so, he said, "[D]o you want to f...g die? I'll
13           f...ing kill you." There was no possibility the jury would have
             interpreted appellant's threat to kill Doe as a threat of future—rather
14           than immediate—harm, particularly where appellant concedes he
             "slapped and threatened [ ] Doe at the same time[.]" Appellant's
15           threat contained no suggestion that it would be carried out at some
             future time. Rather, the threat to kill Doe, coupled with the slaps to
16           her face, were an explicit demonstration of appellant's immediate
             readiness to use force and violence to overcome Doe's resistance
17           and accomplish the sex acts. Even assuming appellant's threats
             could be viewed as threats of future harm, Doe testified appellant
18           threatened to kill her and that she did not try to run away because
             she thought appellant would catch her and kill her, demonstrating "a
19           reasonable possibility that the defendant would carry out the threat."
             (CALCRIM No. 1000.)
20
             The evidence is not—as appellant contends—"'open to the
21           interpretation'" that he is not guilty. The record simply does not
             support a finding that appellant did not accomplish the sex offenses
22           by force or fear and it is not likely a juror would have predicated his
             guilt under the theory of future retaliation. The omission of the
23           definition of future threat from the jury instructions was not
             prejudicial.
24

25   Cal. Ct. App. Opinion at 15-16.

26           2.    <u>Analysis</u>

27           To obtain federal habeas relief for an error in the jury instructions, a petitioner must show

28   that the error "so infected the entire trial that the resulting conviction violates due process."

1   *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  "'A single instruction to a jury may not be judged in

2   artificial isolation, but must be viewed in the context of the overall charge.'"  *Middleton v. McNeil*,

3   541 U.S. 433, 437 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)).  "Even if there

4   is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not

5   necessarily constitute a due process violation."  *Waddington v. Sarausad*, 555 U.S. 179, 190

6   (2009) (quoting *Middleton v. McNeil*, 541 U.S. at 436).  Where an ambiguous or potentially

7   defective instruction is at issue, the court must inquire whether there is a "reasonable likelihood"

8   that the jury has applied the challenged instruction in a way that violates the Constitution.  *Estelle*,

9   502 U.S at 72 & n.4; *Boyde*, 494 U.S. at 380.

10      If a constitutional error is found in the jury instructions, the federal habeas court also must

11   determine whether that error was harmless by looking at the actual impact of the error.  *Calderon*

12   *v. Coleman*, 525 U.S. 141, 146-47 (1998).  The habeas court must apply the harmless-error test set

13   forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a

14   "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Hedgpeth v.*

15   *Pulido*, 555 U.S. at 58 (quoting *Brecht*, 507 U.S. at 623).

16      When, as here, the state court has found the error harmless, relief is not available for the

17   error "unless *the harmlessness determination itself* was unreasonable."  *Davis v. Ayala*, 135 S. Ct.

18   2187, 2199 (2015) (emphasis in original).  In other words, a federal court may grant relief only if

19   the state court's harmlessness determination "was so lacking in justification that there was an error

20   well understood and comprehended in existing law beyond any possibility for fairminded

21   disagreement**.**"  *Id.* (quoting *Harrington v. Richter*, 562 U.S. at 103).

22      The California Court of Appeal's rejection of the instructional error claim as harmless

23   error was not contrary to or an unreasonable application of clearly established federal law.  Like

24   the California Court of Appeal, this Court goes directly to the harmlessness question because the

25   claim is so easily resolved on that basis.  The California Court of Appeal determined that the

26   evidence overwhelmingly pointed to Mr. Boyce's guilt under the first theory of guilt, i.e., direct

27   force and threats of immediate harm, so that the jury would not have dwelled upon whether he was

28   guilty under the alternative theory of a threat of future harm.  Jane Doe testified that he "smacked"

1    or "slapped" her twice and at the same more than once said, "do you want to fucking die?  I'll

2    fucking kill you."  RT 2253.  The evidence did not indicate that these threats pertained to a future

3    harm rather than an immediate harm.  When asked why she did not run out of the room, Jane Doe

4    testified, "I was afraid that he would catch me and harm me or kill me."  RT 2264.  She testified

5    she did not scream because she did not think anyone would hear her and "probably thought that

6    would make him more angry if [she] screamed."  RT 2264.  She further testified she "was scared

7    for [her] life."  RT 2264.  Moreover, even in the unlikely event the jury construed Mr. Boyce's

8    statements as a threat of future harm, he plainly knew where Jane Doe lived and that demonstrated

9    a reasonable possibility that he would carry out the threat in the future.

10        The harmlessness determination is further supported by the fact that the threat of future

11    harm was not argued by counsel.  The prosecutor's closing argument focused on the theory that

12    Mr. Boyce was guilty based on his use of force and fear and threats of immediate harm.  RT 3353-

13    54.  Defense counsel did not address any threat of future harm, as his argument was that Mr.

14    Boyce was unconscious during the assault due to sleepwalking.

15        The very short jury deliberations suggest the jury did not struggle with whether the fear or

16    force element was satisfied or, in fact, whether Mr. Boyce was guilty.  "'Longer jury deliberations

17    weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'"

18    *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) (quoting *United States v. Velarde-*

19    *Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., id.* at 846 (2.5-hour jury deliberations in

20    illegal reentry case suggested any error in allowing testimony or commentary on defendant's post-

21    arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (4-day jury deliberations

22    supported inference that impermissible evidence affected deliberations).  Here, the jury deliberated

23    less than two-and-a-half hours after a six-day trial before returning with a verdict.  *See* CT 148-

24    149; RT 3432.

25        The state appellate court essentially thought the facts presented at trial would not have led

26    the jury to consider the alternative theory of a threat of future harm as a basis for liability and

27    therefore any infirmity in that portion of the instruction was harmless.  That harmlessness

28    determination was not "'so lacking in justification that there was an error well understood and

26

comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Davis v. Ayala*, 135 S. Ct. at 2199 (quoting *Harrington*, 562 U.S. at 103).  Mr. Boyce is not entitled to the writ on this claim.

D.     Prosecutorial Misconduct Claim

Mr. Boyce claims that the prosecutor's closing argument misstated the burden of proof by equating it with a "gut feeling" and thereby violated Mr. Boyce's right to due process.

To evaluate this claim, the context of the allegedly objectionable phrase must be recounted, including the defense closing argument that preceded the prosecutor's statement.  The prosecutor did not discuss the reasonable doubt definition in her main closing argument.  In the *defense* closing argument, defense counsel argued the following about reasonable doubt:

> There's another jury instruction that I'm not going to read, and it's the reasonable doubt jury instruction. . . . [W]hat I do now is I just merely will give you an analysis of what I believe reasonable doubt is.  Because there are several different standards that we have in the criminal justice system, reasonable doubt being the highest.
>
> We have a reasonable suspicion.  That's when a police officer wants to, thinks you're speeding and wants to pull you over.  He has to have a reasonable suspicion that that crime is occurring for him to pull you over.  That isn't reasonable doubt.
>
> Now, let's say the police think that there are [sic] something illegal in your house and they want to go in and search it, they need to get a search warrant.  What they have to show then is probable cause for the issuance of that search warrant.  Once again, that is not reasonable doubt.
>
> The third standard is preponderance of the evidence.  Now, some of you have served on civil trials where the standard is preponderance of the evidence.  That's simply a tipping of the scales, a 51/49, and those are cases where millions and billions of dollars could be at stake, and still it is only a preponderance of the evidence standard.  That standard is still not reasonable doubt.
>
> Next there's a clear and convincing standard.  That is where -- that's a standard that's used where the government wants to take your child away from you or the state wants to put someone in a mental institution for the rest of their lives.  That is still not reasonable doubt.
>
> [¶] Reasonable doubt is the highest standard.  It's the highest.  It's not well, maybe.  It [sic] not well, it could have happened this way.  It's a situation where I believe that five years, ten years from now when you think back on this trial, you say I did the right thing, there was no doubt in my mind, there's no reasonable doubt.  That's the

United States District Court
For the Northern District of California

1
2

best example I can give you.  But *if you have some doubt, if you have some doubt in this case, and there's a tremendous amount of doubt, you must find Brad Boyce not guilty.*

3    RT 3385-3387 (emphasis added).

4    In her rebuttal argument, the prosecutor addressed the reasonable doubt standard.

5
6
7
8
9
10
11

Defense counsel during his closing directed your attention to two specific jury instructions, and again you will be receiving a packet of those jury instructions.  The first he referred to you was the instruction on reasonable doubt.  And defense counsel said that the law is that if you have some doubt, you must find the defendant not guilty.  But that is a misstatement of the law.  The law is provided to you by jury instruction No. 220.  Reasonable doubt leaves you with an abiding conviction that the charge is true.  That's the language of the jury instruction.  It's not that if you have some doubt you must find him not guilty.  The jury instruction goes on to say, the evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

12
13
14
15
16
17

What we're looking for is reasonable doubt.  So the defendant would like you to believe that it's reasonable that he entered that home and was unconscious.  It was reasonable that he made his way in through that gate.  It was reasonable that he sleepwalked into her bedroom and vaginally, anally raped her.  That he threatened her life, that he changed his identity, that he gave her a false name, that he was slapped in the face twice, that he threatened her life, that he forced her to orally copulate him and that he forced his fingers into her vagina, yet he was sleepwalking.  See, he'd like you to think that that is a reasonable recitation of facts, a reasonable story.  And that is for you to decide.

18
19
20

I say that that's nonsense, and I want to be very clear about what the standard is.  See, defense attorneys very much like to put reasonable doubt on a scale and sometimes they'll have a picture or a graph and they put reasonable doubt at the very highest, this almost insurmountable possibility that I couldn't possible reach.  What is it?  It's an abiding conviction of the truth of the charge.

21
22
23
24
25

When I was in law school I didn't like it.  I asked my professor what that meant.  Did it mean that I was 90 percent sure or 99 percent sure?  I like having numbers associated with my standards of proof, and the law professor told me *It's when you know in your gut that it's true.  That's what it means.  It's an abiding conviction that the charge is true.  It's an abiding conviction that you know that Dallas Boyce forcibly raped Jane Doe*, that he knew what he was doing, and that he entered the house with that intent.

26    RT 3388-90 (emphasis added).

27    The California Court of Appeal rejected Mr. Boyce's argument that the italicized argument

28    from the prosecutor amounted to misconduct or misdescribed the burden of proof.  Cal. Ct. App.

28

Opinion at 18.  The state appellate court did not specifically discuss the federal constitutional

claim, and instead analyzed the claim based on similar state law that it is "'improper for the

prosecutor to misstate the law generally, and particularly to attempt to absolve the prosecution

from its prima facie obligation to overcome reasonable doubt on all elements.'"  *Id.* (citation

omitted).

> There was no prosecutorial misconduct. The prosecutor expressly directed the jury to follow the trial court's instructions as to those facts on which the prosecution was required to prove beyond a reasonable doubt. The prosecutor was not—as appellant contends—diluting the People's burden of proof; she was asking the jurors to trust their gut feelings about the evidence.
>
> .   .   .
>
> [T]he prosecutor was not purporting to equate reasonable doubt as a gut feeling. We note the context in which the prosecutor directed the jurors to trust their gut feelings in reviewing the evidence and assessing credibility. After making the "you know in your gut that it's true" reference, the prosecutor repeated the language of the jury instruction on reasonable doubt.
>
> Our conclusion that the prosecutor's comments did not denigrate the reasonable doubt standard "is reinforced by the fact that the trial court had repeatedly admonished the jurors, both at the outset of trial and after closing arguments, that they were required to follow the law and base their decision solely on the law and instructions" as given to them by the court. ([*People v.*] *Barnett* [(1998)] 17 Cal.4th [1044], 1159.)  "Those admonishments were sufficient to dispel any potential confusion raised by the prosecutor's argument. No basis for reversal appears." (*Ibid.*) "Jurors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

Cal. Ct. App. Opinion at 19.

The California Court of Appeal did not separately discuss the federal due process claim

based on prosecutorial misconduct, but there is no reason to depart from the presumption that the

state appellate court rejected the federal constitutional claim on the merits.  *See Harrington*, 562

U.S. at 99-100.  When, as here, the state court rejects a claim without explanation, the federal

habeas court "must determine what arguments or theories supported or . . . could have supported,

the state court's decision; and then it must ask whether it is possible fairminded jurists could

disagree that those arguments or theories are inconsistent with the holding in a prior decision of

[the U.S. Supreme] Court."  *Harrington,* 562 U.S. at 102.

29

United States District Court
For the Northern District of California

The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's comments render a trial fundamentally unfair.  *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.")  Under *Darden,* the inquiry is whether the prosecutor's remarks were improper and, if so, whether the comments infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

The California Court of Appeal's rejection of Mr. Boyce's due process claim was not contrary to or an unreasonable application of clearly established law from the Supreme Court.

The prosecutor's "gut feeling" comment did not violate Mr. Boyce's right to due process. The statement was in the context of a larger argument about reasonable doubt and did not tell the jurors to convict based on just a gut feeling.  "Because 'improvisation frequently results in syntax left imperfect and meaning less than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation will draw that meaning from the plethora of less damaging interpretations.'"  *Williams v. Borg*, 139 F.3d 737, 744 (9th Cir. 1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).  This Court will not infer that the jurors thought they could return a guilty verdict on a hunch or a gut feeling. The prosecutor did not try to equate reasonable doubt with a "gut feeling," and instead made the statement after arguing that Mr. Boyce's sleepwalking defense was "nonsense."  The prosecutor's overall argument was that the jurors should convict only if they had an "abiding conviction" that Mr. Boyce was guilty based on their analysis of the evidence.  The "gut feeling" statement was followed immediately by an accurate paraphrase of the instructions regarding proof beyond a reasonable doubt:  "It's when you know in your gut that it's true.  That's what it means.  It's an abiding conviction that the charge is true.  It's an abiding conviction that you know that Dallas Boyce forcibly raped Jane Doe, that he knew what he was doing, and that he entered the house with that intent." RT 3390.  Further, the prosecutor directed the jury's attention to the court's specific jury instruction on reasonable doubt

30

United States District Court
For the Northern District of California

1   when she argued that "[t]he law is provided to you by jury instruction No. 220.  Reasonable doubt

2   leaves you with an abiding conviction that the charge is true.  That's the language of the jury

3   instruction." RT 3388.

4          The allegedly objectionable comment by the prosecutor also "must be evaluated in light of

5   the defense argument that preceded it," *Darden*, 477 U.S. at 179.  Here, defense counsel had

6   incorrectly suggested to the jurors that *any* doubt at all about Mr. Boyce's guilt required a not-

7   guilty verdict, as he had argued "if you have some doubt, if you have some doubt in this case, . . .

8   you must find Brad Boyce not guilty." RT 3387.

9          The court instructed the jury that the court's instructions on the law governed and

10  prevailed over any argument by the attorneys.  The preliminary jury instructions given before any

11  evidence was introduced included an instruction on the presumption of innocence and reasonable

12  doubt.  RT 2167.  After evidence was presented and the attorneys made their closing arguments,

13  the court instructed the jury with CALCRIM No. 220, which described the prosecution's burden

14  of proof and reasonable doubt.  It is presumed that the jurors followed the instructions they did

15  receive.  *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

16         The prosecutor's statement did not violate Mr. Boyce's right to due process.  The state

17  court of appeal's rejection of the claim was not contrary to, or an unreasonable application of,

18  clearly established federal law.  Mr. Boyce is not entitled to the writ on this claim.

19  E.     No Certificate of Appealability

20         A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

21  which "reasonable jurists would find the district court's assessment of the constitutional claims

22  debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of

23  appealability is **DENIED**.

24  ///

25  ///

26  ///

27  ///

28  ///

31

1

## VI.   CONCLUSION

2     For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits.

3     The Clerk shall close the file.

4

5     **IT IS SO ORDERED**.

6

7     Dated: January 18, 2017

8     _____

9     EDWARD M. CHEN
       United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California